[No. 32919. Department Two. December 9, 1954.]

HOMER L. KEMALYAN *et al., Respondents and Cross-appellants,* v. W. W. HENDERSON *et al., Respondents,* DEACONESS HOSPITAL, *Appellant.*[1]

[1]Reported in 277 P. (2d) 372.

*Cannon, McKevitt & Fraser,* for appellant.

*Graves, Kizer & Graves* and *John E. Snoddy,* for respondents and cross-appellants.

*John D. MacGillivray* and *Willard W. Jones,* for respondents.

DONWORTH, J.—Plaintiffs brought this action against two defendants, a doctor and a hospital, to recover damages for injuries suffered by plaintiff wife during the administration of an anesthetic preparatory to a surgical operation in which her tonsils were to have been removed.

Throughout this opinion, in order to avoid confusion, we will refer to plaintiff wife as plaintiff, to the defendant Dr. Henderson, as the doctor, and to defendant Deaconess Hospital, located at Spokane, as the hospital.

The trial court's instructions submitted to the jury the question of whether the nurse-anesthetist (employed by the hospital) was the agent of the hospital or the agent of the doctor while administering the anesthetic to plaintiff. The court also instructed the jury that plaintiff might recover under the doctrine of *res ipsa loquitur* if the jury found facts necessary to the application of that doctrine, or that plaintiff also might recover if the jury found that the nurse (as agent of either defendant) had committed specific acts of negligence.

A verdict for plaintiff, assessing her damages in the amount of $6,051.54, was returned against the hospital. The jury also returned a verdict for the doctor and against plaintiff.

Motions for judgment notwithstanding the verdict or for a new trial were made by the hospital and denied by the trial court. Judgment in the amount of $6,051.54 was entered for plaintiff against the hospital.

Plaintiff also moved for judgment notwithstanding the verdict or for a new trial in her action against the doctor. The motions were denied, and a judgment of dismissal in favor of the doctor was entered.

Defendant hospital has appealed from the judgment against it, and plaintiff has cross-appealed from the judgment dismissing the action as to the doctor.

Plaintiff's cross-appeal is prosecuted only on a contingent basis, inasmuch as she urges this court to reverse the judgment of dismissal in favor of the doctor *only in the event* of a reversal of her judgment against the hospital. Consequently, since an affirmance of the judgment against the hospital would automatically dispose of the cross-appeal, we will first consider the hospital's appeal.

The hospital has made twelve assignments of error, which raise these issues: (1) Did the trial court err in refusing to grant the hospital's motions for a directed verdict or for judgment n.o.v. on grounds that the evidence conclusively proved, as a matter of law, that the nurse-anesthetist was the agent of the doctor and not of the hospital? (2) Did the court err in instructing the jury on the doctrine of *res ipsa loquitur*? (3) Did the court err in allowing three surgeons to testify, over objections by the hospital, that it was the custom of surgeons in that locality to rely wholly on the anesthetists supplied by hospitals, and that they customarily did not exercise any supervision over such anesthetists?

This court is fully committed to the rule that a motion for a directed verdict, or for judgment notwithstanding the verdict, admits the truth of the evidence of the party against whom the motion is made and all inferences that reasonably can be drawn therefrom, and requires that the evidence be interpreted most strongly against the moving party and in the light most favorable to the opposing party. *Myers v. Little Church by the Side of the Road,* 37 Wn. (2d) 897, 227 P. (2d) 165; *Olsen v. White,* 37 Wn. (2d) 62, 221 P. (2d) 542.

■ We likewise follow the rule that, in ruling upon a challenge to the sufficiency of the evidence, a motion for directed verdict or a motion for judgment notwithstanding the verdict, no element of discretion is involved, and the trial court can grant such motions only when it can be held as a matter of law that there is no evidence nor reasonable inference from evidence to sustain the verdict. *Williams v. Hofer,* 30 Wn. (2d) 253, 191 P. (2d) 306.

The facts in this case, viewed most favorably to the plaintiff, may be summarized thus:

Plaintiff, a trained nurse, needed to have her tonsils removed. She was referred by Dr. Newman, her family physician, to defendant Dr. Henderson, an eye, ear, nose and throat specialist. Plaintiff was allergic to novocaine, and consequently asked to be given a general anesthetic (ether) rather than a local anesthetic (novocaine).

On October 24, 1951, Dr. Henderson arranged to have plaintiff enter the Deaconess Hospital on October 26, 1951, for an operation for the removal of her tonsils. He arranged for the use of an operating room at the hospital and requested the hospital to provide an anesthetist to administer a general anesthetic. Until the doctor entered the operating room immediately prior to going to the "scrub room" to sterilize his hands, he did not know which nurse-anesthetist would be assigned for that purpose.

When the doctor entered the operating room on the morning of October 26, 1951, plaintiff was in the room. The doctor identified her as his patient to Miss Esther Rudkin, the nurse-anesthetist assigned by the hospital to administer the anesthetic. Miss Rudkin was a specialist in giving anesthetics, having taken a special course to qualify her for that work. She had been actively engaged in her profession as a nurse-anesthetist for more than twenty-three years, and had been so employed at Deaconess Hospital in Spokane for twenty years. She had previously served as anesthetist for Dr. Henderson many times in tonsillectomy cases, and he considered her well trained and qualified as an anesthetist.

After telling Miss Rudkin that plaintiff was to be given a general anesthetic (which meant ether), the doctor left the operating room to go to the scrub room. Hospital rules required him to spend at least ten minutes there sterilizing his hands. While he was out of the operating room, Miss Rudkin, as was her usual custom, began to put the patient (plaintiff) to sleep by anesthetic. The anesthetist first administered vinethene by the drop method, using a facial mask, until plaintiff "went to sleep." Then, she connected a rubber tube, called a nasal catheter, to the ether machine and inserted the tube in one of plaintiff's nostrils, pushing the tube in a distance of beween three and half and four inches. The nasal catheter, or tube, was to be used to administer a mixture of ether and air directly into plaintiff's lungs to keep her properly anesthetized during the operation. Use of a nasal catheter was the usual and normal procedure during such operations.

Miss Rudkin had connected the rubber tube to the ether machine and had inserted the tube in plaintiff's nose before Dr. Henderson first noticed plaintiff after he returned to the operating room from the scrub room. The doctor seated himself on a small stool six or eight feet away from the operating table and waited for the nurse-anesthetist to tell him that plaintiff was ready to be operated upon. In about three minutes Miss Rudkin indicated that she thought plaintiff was ready. The doctor got up and picked up a mouth gag, which is an instrument made of metal used to hold a patient's mouth open by mechanical means during a tonsillectomy.

As the doctor and Miss Rudkin worked to insert the mouth gag in plaintiff's mouth, Miss Rudkin decided that plaintiff was not sufficiently anesthetized to start the operation, since there were still reflexes in plaintiff's throat, and there was some difficulty in inserting the mouth gag. Consequently, Miss Rudkin so advised the doctor and suggested that plaintiff needed some more anesthetic. The doctor went back to the stool and sat down again. Miss Rudkin regulated the ether machine so as to cause it to emit a greater volume of

ether-impregnated air through the nasal catheter. After about a minute, Miss Rudkin noticed that plaintiff's abdomen seemed quite prominent and called the doctor's attention to that fact. Miss Rudkin immediately turned off the ether machine and removed the nasal catheter.

Plaintiff's tonsils were not removed. She was taken out of the operating room and placed in a hospital bed. When she regained consciousness, she discovered that her abdomen was greatly distended, and she was suffering from a great deal of pain and internal distress. X rays later disclosed that free air and gas had somehow penetrated the viscus of her stomach, or intestines, and had collected in the abdominal cavity. She was discharged from the hospital eleven days later. Since there is no question involved concerning the extent of her injuries, we omit a description of her physical condition, except to say that at that time her abdomen was greatly distended and she was still suffering a great deal of pain.

After she was discharged from the hospital, plaintiff moved to California, where she was treated by Dr. Gordon Lamb, an internal specialist, who obtained a history of the incident which caused the injury to plaintiff from the hospital and Dr. Henderson.

On the issue of whether, while administering the anesthetic, Miss Rudkin was the agent of the hospital, which employed her, or of Dr. Henderson, who was to perform the operation on plaintiff, Miss Rudkin's testimony (that part of it most favorable to plaintiff's case against the hospital) was as follows:

"Q. Dr. Henderson was out of the surgical room for at least ten minutes while you were proceeding with the anesthesia? A. That is right. Q. And Dr. Henderson, before he left the room, gave you no directions or exercised any supervision over you as to what method you should use in anesthetizing Mrs. Kemalyan? A. No, he didn't. Q. In other words, that was your job that you were there to do and not the Doctor's job? A. Yes. Q. Then, after Dr. Henderson returned to the room and you proceeded to put in the nasal tube, he gave you no directions as to how to do it? A. No, he did not. Q. And didn't exercise any supervision over you?

A. No, he did not. Q. In other words, again that was your job that you were trying to do and not the Doctor's job? A. That is right."

Dr. Henderson testified that Miss Rudkin knew considerably more about administering an anesthetic than he did, and that he left completely to her discretion the administration of the ether to the plaintiff. He also testified that all surgeons in Spokane customarily relied wholly on the nurse-anesthetists or physician-anesthetists supplied by the hospitals to administer anesthetics during surgical operations. Three other surgeons called by Dr. Henderson testified to the same effect.

On the basis of the facts outlined above, the hospital argues that the trial court should have held, as a matter of law, that the nurse-anesthetist, Miss Rudkin, was not the agent of the hospital but was a "loaned servant" who was the agent of the doctor during the administration of the ether to plaintiff. Counsel for the hospital cite a number of cases from other jurisdictions in support of the proposition that the court should have so held. The difficulty with this argument is that the facts in all of the cases cited are so different from the facts in this case that they cannot be considered as authority for the hospital's position.

Viewing the evidence in the light most favorable to the plaintiff under the rules hereinabove stated, we cannot hold that the trial court erred in denying the hospital's motions for a directed verdict and for judgment n.o.v.

■ The trial court correctly submitted the issue of agency to the jury, since the evidence regarding it was in conflict. There was ample evidence from which the jury could, and apparently did, conclude that the nurse-anesthetist was not the agent of the doctor but was in fact the agent of the hospital, her employer. Normally, the hospital charged patients for the very services which Miss Rudkin was rendering to plaintiff when this injury occurred. In the case at bar, the hospital made no charge to plaintiff for any services furnished her while she was in the hospital.

We turn now to the second issue, that of the application

of the doctrine of *res ipsa loquitur*. The court instructed the jury on the elements of *res ipsa loquitur* in instruction No. 8. No contention is made that the instruction does not correctly set out the elements of the doctrine. Appellant hospital contends, however, that, under the facts in this case, no instruction on *res ipsa loquitur* should have been given. The hospital further contends that the trial court should not have given instruction No. 10, reading as follows:

"By instructing you upon the doctrine of res ipsa loquitur the court does not mean to require that your verdict for the plaintiffs, if your verdict be for the plaintiffs, must necessarily be reached by an application of the doctrine of res ipsa loquitur, for you may return a verdict for the plaintiffs and against either or both defendants, regardless of the doctrine of res ipsa loquitur, if you find from the preponderance of the evidence that Esther Rudkin was negligent and such negligence proximately caused plaintiff's injuries and that she was the agent of either or both defendants, as the case may be."

The gist of the hospital's argument is that, since there was some testimony from which the jury could have concluded that the injuries to plaintiff were caused by specific acts of negligence, there was no necessity for the giving of any instructions on *res ipsa loquitur*, and the giving of such instructions was therefore reversible error. As authority for the foregoing proposition, the hospital relies primarily on *Carbery v. Fidelity Savings & Loan Ass'n*, 32 Wn. (2d) 391, 201 P. (2d) 726.

In the *Carbery* case, plaintiff was injured when she was struck by, or collided with, the door of an elevator in defendant's building as she was getting off. Her complaint contained no general allegation of negligence indicating that she was injured as a result of causes unknown to her. On the contrary, the complaint alleged that she was injured because the elevator operator "carelessly and negligently" allowed the door to close against her. Her witnesses testified to specific acts of the elevator operator constituting negligence, and to oral admissions made by him to the effect that he was negligent. The elevator operator and another

witness for defendant testified that he had not been guilty of the acts of negligence attributed to him by plaintiff's witnesses, and that plaintiff had walked into the door. Thus the issues for the jury were clearly drawn. The issues were: (1) Did the elevator operator negligently let the door slip out of his hand and close on plaintiff, or (2) did plaintiff negligently walk into the door before it could be fully opened? There was no testimony from which the jury could infer that the injuries were occasioned by some unknown cause. Either the accident happened as plaintiff's witnesses said it did, or it happened as defendant's witnesses said it did.

Under those circumstances, we said in the *Carbery* case, *supra*:

"Unless the issues in an action such as this present *a general charge of negligence, which is not fully explained,* there is no place for the application of the doctrine of *res ipsa loquitur.* This doctrine brings into operation an inference or presumption of negligence, when it is alleged that the plaintiff suffered injury as the result of the operation of an instrumentality under the exclusive control of the defendant, the injury having been occasioned by some *unexplained cause,* and the general situation showing that no injury would have resulted, in the ordinary course of events, without some negligence on the part of the defendant. If the injury suffered was the result of *an explained cause or some specific act of negligence on the part of the defendant, which act is definitely described,* there is no place for inference and the doctrine of *res ipsa loquitur* does not apply." (Italics ours.)

It should be further noted that in the *Carbery* case all of the evidence about a *"specific act of negligence on the part of defendant"* was given by *plaintiff's witnesses.*

Turning now to the case at bar, we find that plaintiff's amended complaint does contain a general allegation of negligence which indicates that she was injured as a result of a cause unknown to her. The amended complaint also alleges a number of specific acts of negligence on the part of defendants which she hoped to be able to prove.

Plaintiff testified that she did not know how she was injured because she was unconscious at the time. By calling

Dr. Henderson as an adverse witness, and by putting in evidence the deposition of Miss Rudkin, plaintiff did produce some testimony from which the jury might infer that the accident occurred because the nurse-anesthetist negligently allowed the nasal catheter to slip into plaintiff's esophagus, or negligently allowed plaintiff to swallow the catheter, or negligently failed to "anchor" the catheter so it could not slip into the esophagus. Dr. Lamb, testifying by deposition, said that, in his opinion, the only way the accident could have occurred would have been for the nasal tube to have dropped down into the esophagus instead of remaining up in the pharynx where it belonged, thereby forcing into the stomach the ether which should have gone into the lungs.

Dr. Henderson, called by plaintiff as an adverse witness, testified as follows:

"Q. Isn't it your opinion that the tube did, probably, slip down into the esophagus and that the ether had inflated the gut? Isn't that your opinion? A. That was my first thought. . . . Q. In your opinion, this tube got down past that to the esophagus? A. Well, in reference to the opinion I have expressed, I thought perhaps the top of the tube might have gotten down into the esophagus past the cricoid. Q. And it was certainly improper procedure to allow the top of the tube to get down into the esophagus? Isn't that correct? A. Well, it would be a thing that you would try to avoid. Q. And it is improper, then? In other words, it is not proper to inflate the stomach or vacuum with ether and air? A. No."

When examined later by his own attorney, the doctor testified:

"Q. In other words, Doctor, as I take it, for several minutes the anesthesia by Miss Rudkin proceeded properly, and then apparently something happened? Is that correct? A. That is correct. Q. And you yourself don't know what did happen? A. No, I can't say."

We held in *Carbery v. Fidelity Savings & Loan Ass'n, supra,* that when a general charge of negligence is *fully explained* by plaintiff's evidence, the doctrine of *res ipsa loquitur* cannot be applied. Here, however, the evidence did not fully explain the general charge of negligence. The

testimony went no further than to suggest to the jury how the injury could have, and probably did, occur. Furthermore, in this case almost all of the testimony tending to prove specific acts of negligence was given by defendants' witnesses, or by adverse witnesses called by plaintiff.

█ The correct rule is that a plaintiff will be bound by the testimony of his own witnesses as to how an accident causing injury occurred and can no longer rely on *res ipsa loquitur* when his evidence, if believed by the jury, will fully explain how the injury was inflicted. *Carbery v. Fidelity Savings & Loan Ass'n, supra.* But, ordinarily the plaintiff is not bound by the testimony of defendant nor his witnesses, and consequently plaintiff may continue to rely on *res ipsa loquitur* even if defendant's testimony, if believed by the jury, would fully explain how the event causing injury to plaintiff occurred. *Nopson v. Wockner*, 40 Wn. (2d) 645, 245 P. (2d) 1022; *Covey v. Western Tank Lines,* 36 Wn. (2d) 381, 218 P. (2d) 322; *D'Amico v. Conguista,* 24 Wn. (2d) 674, 167 P. (2d) 157; *Mahlum v. Seattle School Dist. No. 1,* 21 Wn. (2d) 89, 149 P. (2d) 918; *Case v. Peterson,* 17 Wn. (2d) 523, 136 P. (2d) 192.

In the recent case of *Nopson v. Wockner, supra,* we said:

"All that the doctrine [of *res ipsa loquitur*] requires of the defendants to defeat the *prima facie* case established against them with its aid, is the production of evidence which, if believed, permits the trier of the facts to say that it was as probable that they were not negligent as that they were. *The permissible inference of negligence to be drawn from the circumstances of the case must be balanced against the evidence of the defendants, and has weight so long as reasonable men can still draw the inference from the facts in evidence.* Prosser on Torts 308, § 44." (Italics ours.)

█ Our prior cases which have considered the effect of defendant's evidence as to specific cause have enunciated one qualification to the general rule that plaintiff is not ordinarily bound by defendant's evidence in *res ipsa* cases. That qualification is that, if defendant's evidence shows so clearly that he was not guilty of any acts of negligence that the minds of reasonable men cannot differ on the issue,

then the cause of the injury to plaintiff has been fully explained, and plaintiff cannot rely on *res ipsa loquitur* to take his case to the jury. *Covey v. Western Tank Lines, supra.*

In the *Covey* case, we said:

"If the evidence submitted by either or both parties is so completely explanatory of how the accident occurred that no inference is left that the accident may have happened in any other way, there is nothing left upon which the doctrine [of *res ipsa*] need or can operate. *Anderson v. Harrison,* 4 Wn. (2d) 265, 103 P. (2d) 320; *Morner v. Union Pac. R. Co., supra* [31 Wn. (2d) 282, 196 P. (2d) 744]."

■ We have found no prior decision of this court (and none has been cited by the parties) in which we have discussed the question of whether a plaintiff may rely on *res ipsa loquitur* if *defendant's* evidence tends to prove that he was guilty of some specific act of negligence toward plaintiff. However, it generally has been recognized in most jurisdictions where the matter has been considered that, even if *defendant's* evidence tends to prove that he was guilty of specific acts of negligence (as some of defendants' evidence here tended to indicate), the plaintiff will not be deprived of the benefits of *res ipsa loquitur* if he is otherwise entitled to rely on the doctrine. See annotation on "Effect of defendant's evidence as to specific cause; plaintiff's evidence on cross-examination or in rebuttal," 33 A. L. R. (2d) 799 (1954), and cases cited therein.

■ Applying the foregoing rule to the case at bar, we hold that (1) plaintiff's evidence did not so fully explain how the event causing injury to her occurred as to preclude her from relying on *res ipsa loquitur*; and (2) plaintiff was not bound by defendant's testimony as to the cause or causes of the incident resulting in injury to herself, since that testimony did not so clearly explain how the injury occurred that the minds of reasonable men could not differ on the issue.

A subsidiary issue on this phase of the case having to do with the applicability of the doctrine of *res ipsa loquitur* is raised by the hospital's contention that the trial court erred

in submitting instruction No. 10, hereinabove quoted. That instruction allowed the jury to find for plaintiff either on the theory that defendants were guilty of specific acts of negligence or on the theory of the *res ipsa loquitur* doctrine. The hospital asserts in effect that a plaintiff cannot allege and prove specific acts of negligence and still rely on *res ipsa loquitur*.

We have on a number of occasions held that a plaintiff can allege and attempt to prove specific acts of negligence on the part of defendant and still rely on *res ipsa loquitur*, and especially so when the allegation of specific acts of negligence is coupled with a general allegation of negligence on defendant's part. *Covey v. Western Tank Lines, supra*; *Morner v. Union Pac. R. Co., supra*; *Mahlum v. Seattle School Dist. No. 1, supra*; *Case v. Peterson, supra*, and *Highland v. Wilsonian Inv. Co.*, 171 Wash. 34, 17 P. (2d) 631. This rule is subject to the qualification (already mentioned) that if plaintiff's evidence goes so far as to *fully* explain the cause or causes of the accident which injured him, he loses the right to rely on *res ipsa,* but an unsuccessful attempt to prove specific acts of negligence on the part of defendant does not deprive plaintiff of his right to rely on *res ipsa. Covey v. Western Tank Lines, supra.*

On the authority of the foregoing cases, we hold that there is no merit in the hospital's contention that the trial court erred in giving instruction No. 10.

Appellant hospital's last assignment of error is that the trial court erred in allowing the doctor to present the testimony of three eye, ear, nose and throat specialists to the effect that it was the custom in Spokane hospitals for such specialists to rely entirely upon the nurse in the giving of an anesthetic. The hospital urges that such testimony was inadmissible because no such custom was pleaded by the doctor as a defense.

There are a number of exceptions to the general rule that custom must be pleaded. See *Codd v. Westchester Fire Ins. Co.*, 14 Wn. (2d) 600, 128 P. (2d) 968, 151 A. L. R. 316, and cases cited therein. In the *Codd* case, we said:

"It has been held in negligence cases that a custom, although not pleaded, may be proved

" '. . . as an evidentiary fact tending to prove an ultimate pleaded fact, or as an evidentiary fact tending to prove a fact that tends to prove an ultimate pleaded fact.' *Donk Bros. Coal & Coke Co. v. Thil,* 128 Ill. App. 249, 23 Am. Cas. 1064."

In the case at bar, the doctor's answer alleged that Miss Rudkin was not his agent during the administration of the anesthetic. The testimony of the three surgeons as to the custom in Spokane hospitals constituted an evidentiary fact tending to prove that Dr. Henderson did rely on the nurse-anesthetist and did not exercise any supervision or control over her actions as an anesthetist. These facts tended to prove the ultimate pleaded fact that she was not his agent during the administration of the anesthetic. Therefore, the trial court did not err in allowing the introduction of such testimony.

We have considered all the assignments of error set out and discussed in the briefs of the hospital and do not find any error on the part of the trial court in the matters complained of. The judgment in favor of the plaintiff against the hospital is, therefore, affirmed.

Plaintiff having in effect waived her cross-appeal in the event of an affirmance of her judgment against the hospital, the cross-appeal is hereby dismissed, with costs to the doctor.

GRADY, C. J., SCHWELLENBACH, HILL, and WEAVER, JJ., concur.